UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

MIKE McCARTHY,                    )
                                  )
            Plaintiff             )
                                  )
      v.                          )   Case No. 2:04 cv 369
                                  )
JO ANNE B. BARNHART,              )
Commissioner of Social Security,  )
                                  )
            Defendants            )


OPINION AND ORDER

This mater is before the court on the Motion for Summary Judgment filed by the plaintiff, Mike McCarthy, on January 28, 2005. For the reasons set forth below, the motion is GRANTED.

Background

The plaintiff, Mike McCarthy, initially applied for Disability Insurance Benefits on November 4, 1999, alleging a disability onset date of June 13, 1999. (Tr. 69, 92) The Social Security Administration ("SSA") denied his application on March 9, 2000, and again upon reconsideration on September 6, 2000. (Tr. 35, 44) McCarthy requested a hearing before an administrative law judge ("ALJ") on September 28, 2000, and a hearing was held before ALJ Percival Harmon on January 18, 2001. (Tr. 46, 49) Subsequent to the hearing at which McCarthy testified along with his wife Margaretta, medical expert ("ME") Dr. Ashok G. Jilhewar, and vocational expert ("VE") Leonard Fisher, the ALJ denied McCarthy's application by written decision dated April 17, 2001. (Tr. 228-236) On May 23, 2001, McCarthy requested that the Appeals Council review the ALJ's decision, and on September 15, 2001, the

Appeals Council granted the request, vacated the ALJís decision, and remanded the case for further proceedings. (Tr. 242, 243) A second hearing was held before the ALJ on July 2, 2002, at which McCarthy, his wife, Dr. Jilhewar, and VE Thomas Dunleavy testified. (Tr. 374) On September 23, 2003, the ALJ again denied McCarthyís application. (Tr. 23-31). The Appeals Council finally rejected McCarthyís application on June 24, 2004. (Tr. 9) McCarthy filed his complaint in this court on September 16, 2004.

McCarthy was born on August 24, 1963 in Germany and was 40 years old at the time of the ALJís second decision. (Tr. 92) He completed high school and one year of college. (Tr. 103) Beginning in 1985, McCarthy worked as a laborer in the steel mills. His last jobs were as a warehouseman for U.S. Steel, and then in 1990, as a millwright. (Tr. 106) As a millwright, McCarthyís responsibilities included performing regular maintenance on the plantís hydraulic and pneumatic equipment, changing the oil on plant equipment, and operating a forklift. (Tr. 304) The job required McCarthy to lift up to 25 pounds frequently, walk for three hours, stand for two hours, sit for two hours, and use hand tools, a pipe threading machine, drill press, and bearing press. (Tr. 107)

Auditory tests conducted at the University of Kansas Medical Center Audiology Clinic when McCarthy was seven years old showed that he had an 85% sensorineural hearing loss in his left ear and an approximately 40% sensorineural loss in the right ear. (Tr. 125)

2

During 1990, the same year that McCarthy first worked as a warehouseman and then millwright, he began experiencing back pain. (Tr. 307) A bone imaging performed by Dr. Martin R. Hall on October 9, 1991 indicated "mild degenerative osteoarticular changes of the extremities, vertebral column and joints" that were "suggestive of unilateral spondylolysis." (Tr. 224) However, McCarthy's back problems intensified in 1995 when he fell eight feet from a scaffolding after becoming dizzy at work. (Tr. 307-08, 330) The record is unclear regarding the extent of treatment McCarthy required as a result from the fall. (Tr. 332) However, he testified that a mill clinical therapist suggested the possibility of surgery and prescribed a back brace. (Tr. 337) According to McCarthy, the effect of his back injury was minimized because co-workers, "knew that I had back problems . . . and unless they really needed me, they would leave me alone." (Tr. 433) During his last year with U.S. Steel, McCarthy missed 132 days of work as the result of multiple conditions, including his back pain, diverticulitis, hiatal hernia, polyps, tinnitus, dizziness, and persistent nausea and vomiting. (Tr. 336, 97) McCarthy left U.S. Steel in July 1999, approximately one month after a series of hospital visits.

On June 13, 1999, McCarthy went to the hospital emergency room complaining of sharp abdominal pains. (Tr. 158) He was seen by Dr. Felciano Jiminez and Dr. Matthew Glowacki, who suggested a possible diagnosis of diverticulitis, prescribed Colase and Keflex, and released McCarthy that same day. (Tr. 157, 162) Three

days later, McCarthy returned to the emergency room with abdomi-
nal pain. (Tr. 153) CT scans taken during that visit revealed
"diverticula scattered throughout the sigmoid region of the
colon." (Tr. 155) On June 24, 1999, McCarthy returned to the
hospital a third time with severe nausea and vomiting and was
admitted for a period of two days. (Tr. 167, 169) During this
stay, he underwent gastroscopy and colonoscopy procedures and was
diagnosed with gastroenteritis, hiatal hernia, and colon polyp
and diverticula. (Tr. 174, 169) Upon his discharge, Nurse J.
Garrett checked boxes on a discharge form indicating that McCar-
thy could bathe, use the toilet, dress, walk, and eat without
assistance. (Tr. 217)    On October 11, 1999, ear, nose and
throat specialist Dr. M. Shetty examined McCarthy, who complained
of increased hearing loss and ringing in his ears following a
plane trip to attend his brother-in-law's funeral. (Tr. 122) Upon
examination, Dr. Shetty noted tinnitus. (Tr. 123) Testing done by
Dr. Shetty further revealed that McCarthy's unaided discrimina-
tion in his right ear was 92% and that his left ear was nonre-
sponsive.  (Tr. 124)

On December 6, 1999, Dr. Suresh Mahawar completed the first
of three consultative exams of McCarthy on behalf of the Disabil-
ity Determination Bureau ("DDB"). (Tr. 126) At the exam, McCarthy
reported that his back pain began in 1980[1] and that his back was

---

[1]The indication that McCarthyís back pain began in 1980 is likely a
typographical error. At subsequent Consultative Exams as well as hearings
before the ALJ, McCarthy consistently reported that his back pain first
materialized in 1990.

further injured while lifting a heavy box at work. (Tr. 126) He reported that his pain was constant, sharp, and aching, and included numbness and tingling, and radiated to his legs. (Tr. 126) McCarthy told Dr. Mahawar that he experienced muscle spasms and that his pain increased with bending, coughing, and squatting, and improved when lying down. (Tr. 126) He said that he could not walk more than a quarter of a mile or climb more than one to two flights of stairs. (Tr. 126) At the time of the exam, McCarthy was not taking medication for his back pain and had not "recently" seen a physician. (Tr. 126)

Upon examination, Dr. Mahawar found McCarthy's hearing was "moderately decreased" in the right ear and "markedly decreased" in the left ear, while noting that McCarthyís hearing aid was malfunctioning. (Tr. 127) He also observed that McCarthyís gait was "mildly antalgic without [an] assistive device," that he had mild difficulty getting on and off the exam table, that he had severe difficulty in squatting and arising, and that he "did not want to try" hopping on one leg. (Tr. 127-28) Dr. Mahawar also found mild tenderness on McCarthyís spine at LS. (Tr. 127) His diagnostic impression was that McCarthy suffered from "moderate to severe hearing loss" and "chronic low back pain." (Tr. 128)

On December 7, 1999, Dr. D. Dubois reviewed the medical evidence on file for the DDB and concluded that McCarthy had a mildly restricted range of motion in his lower spine and extremities and that "recent audiogram shows hearing loss but not at listing levels." On December 28, 1999, following a request for

clarification, Dr. Dubois clarified that an otolaryngology exam was required by the listing regulations, though Dr. Dubois added "I admit it doesn't seem necessary in this case." (Tr. 131) Subsequently, Dr. Howard Kotler of Chicago Otolaryngology Associates examined McCarthy on February 8, 2000. (Tr. 132) In a brief letter regarding the exam, Dr. Kotler stated that McCarthy "has no complaints of tinnitus, nausea, vomiting, vertigo, otalgia, or otorrhea." (Tr. 132) Dr. Kotler's report of the examination is limited to a single sentence, "Physical examination reveals a patent external auditory canal, intact tympanic membrane, and well aerated middle ear space." (Tr. 132)

However, on that same day, clinical audiologist Leslie Pelton examined McCarthy and reported a "history of noise exposure [and] tinnitus." (Tr. 133) Pelton noted that McCarthy wore a completely-in-the-canal hearing aid but expressed "numerous communication complaints" with and without hearing aid use. (Tr. 133) Pelton's testing revealed profound hearing loss in the left ear and mild hearing loss in the right ear at certain frequencies that became moderately severe to profound at other frequencies. (Tr. 133) Pelton concluded that McCarthy could be expected to do work-related activities with binaural amplification, but that he should work in environments that were free of background noise and that he would have "difficulty understanding other people unless spoken to face-to-face." (Tr. 133)

In a Reconsideration Disability Report completed on April 16, 2000, McCarthy reported that over the course of 1999 his back

6

pain grew worse and prevented him from standing, sitting, or walking for more than 30 minutes. (Tr. 112) He stated that using the bathroom and dressing himself had become "very taxing" and that his tinnitus had affected his concentration and his ability to sleep. (Tr. 112) He further reported that he rarely left the house because of his back condition. (Tr. 114) McCarthy also noted that he suffered from a hiatal hernia, polyps, diverticulitis, perenitius, and tinnitus, as well as stomach problems, which he attributed to the amount of over-the-counter drugs he took to relieve his back pain. (Tr. 115)

An SSA adjudicator, Susan Lee, contacted McCarthy and his fiancee (now his wife) Margaretta on June 14, 2000. (Tr. 118) Margaretta told Lee that McCarthy no longer was able to take out the trash, that his condition had affected their sex lives, and that she took his meals to him because it was difficult for him to come down the stairs. (Tr. 188) She also told the adjudicator that his hearing seemed to be degenerating and that he continued to vomit a lot. She further noted that McCarthy took Tylenol and Motrin daily. (Tr. 118)

On July 29, 2000, Dr. Mahawar conducted a second consultative exam of McCarthy for the DDB. (Tr. 138) At the exam, McCarthy reported that he had been diagnosed with spondylolisthesis and again described the pain as radiating from his lower back to his right leg. (Tr. 138) He told Dr. Mahawar that his pain increased with prolonged sitting and improved only when lying down. (Tr. 138) He stated that he could walk no more than two to

7

three blocks and was not able to climb more than one flight of
stairs. (Tr. 138) Dr. Mahawar again characterized McCarthyís gait
as "mildly antalgic." (Tr. 140) Dr. Mahawar also reported that
McCarthy experienced mild difficulty hopping, walking on his toes
and his heels, and "did not want to try" squatting and arising.
(Tr. 140) The record does not indicate that Dr. Mahawar checked
for spinal tenderness during this exam. (Tr. 139)

On August 31, 2000, Dr. Dubois completed a Physical Residual
Functional Capacity assessment ("RFC"), addressing only McCar-
thyís hearing loss. (Tr. 142) The RFC did not list any exertion-
al, postural, or manipulative limitations. (Tr. 142-45) According
to Dr. Dubois, McCarthyís communicative limitations included
hearing loss, but he "respond[ed] well to aids," although he
"should avoid work areas requiring acute hearing." (Tr. 146)

At the first ALJ hearing on January 18, 2001, McCarthy
testified that the reasons he stopped working included his back
condition, his stomach condition, and concern for his safety
based upon his experience of dizziness. (Tr. 307) He stated that
he remained in bed each morning for two to three hours because of
his back pain. (Tr. 310) Although he occasionally went down
stairs and sat in a recliner, he remained in bed for up to three
or four days at a time several times a month, and for the past
year, spent most of the day in bed. (Tr. 310, 343) Although he
was prescribed daily exercises following his fall in 1996 or
1997, he could perform only some of the exercises because others
were "too extreme" to be accomplished. (Tr. 314) He further

8

testified that he experienced pain if he sat for more than 15 minutes, had trouble bending, squatting, or reaching overhead, and was assisted by his wife in getting dressed, but that he could lift a book from the night stand. (Tr. 327, 329)

McCarthy also testified that his experience of tinnitus had become constant over the past two years. (Tr. 312) He described it as a constant ringing that prevented him from focusing on reading. (Tr. 312) He stated that he experienced dizziness, which he described as blurred vision and a sensation that his head started "becoming a cloud and you just cannot focus," once or twice every two days. (Tr. 342) He testified that his symptoms included tinnitus, vertigo, and vomiting. (Tr. 321) Dr. J. Winston Harper had referred McCarthy for testing for Meniere Disease, which was to take place subsequent to the hearing. (Tr. 338)

McCarthy's wife, Margaretta, testified that McCarthy's dizziness resulted in frequent trips to the emergency room in 1999. (Tr. 345) She testified that McCarthy's back pain had grown worse over the past year and a half and that he remained in bed because "he can't move because he's in so much pain." (Tr. 349) She said that Dr. Jiminez had prescribed codeine and that Dr. Ghandi had prescribed additional pain medication, which McCarthy stopped taking due to an allergic reaction. (Tr. 349, 350) Since then, McCarthy has relied on over-the-counter medication because, according to Margaretta, it was milder on his stomach. (Tr. 351)

9

Following the McCarthys' testimony, Medical Expert Dr. Ashok Jilhewar, reported that the record did not contain documentation to support McCarthyís claim of spondylolisthesis. (Tr. 352) He noted that Dr. Mahawarís consultative exams of December 6, 1999 and July 29, 2000 both contain references to chronic lower back pain, but opined that the findings suggested improvement between the first and the second exam. (Tr. 352) Dr. Jilhewar further stated that McCarthyís hiatal hernia, diverticulitis, and colonic polyps had no effect on his conclusion that McCarthyís impairments did meet or equal a listed impairment and noted that Dr. Dubois' RFC did not describe exertional limitations. (Tr. 299, 352-353, 357). However, he criticized the RFC for not giving credit to McCarthy's symptoms. (Tr. 357) Dr. Jilhewar concluded that, with further documentation, he would limit McCarthy to light work with a sit/stand option with the further limitations of face-to-face communication and a restriction on telephone use. (Tr. 357) Without this documentation, he projected McCarthy's RFC to be for medium work with the same limitations. (Tr. 357) Dr. Jilhewar noted that without neurological evidence, he was unable to determine what grade of spondylolisthesis McCarthy may suffer from and consequently what impact it would have on his RFC. (Tr. 358)

Vocational Expert Fischer reviewed McCarthyís prior employment, noting that it included heavy and medium exertional activity as well as activity consistent with skilled and semi-skilled positions. (Tr. 369)

Following the hearing, McCarthy provided the records from the June 13, June 16, and June 24-26, 1999 hospital stays, the bone imaging from October 1991, and the records from McCarthyís examinations by Dr. Martin Hall dated September 1991 through October 1996 (Tr. 166-217, 219) He also submitted the results of a January 27, 2001 lumbosacral MRI which was taken a little over a week after the hearing. (Tr. 219) This MRI showed "grade I spondylolisthesis between L5 and S1," "moderate spinal stenosis of the bilateral neural foramina,"  and "associated moderate degeneration of L5-S1." (Tr. 220) The MRI further showed "mild degeneration of the L2-L3 and L3-L4" and "rather minimal bulging disc." (Tr. 220)

In denying disability benefits on April 17, 2002, ALJ Harmon found that McCarthy had not engaged in substantial gainful activity since at least November 18, 1999. Next, the ALJ found that McCarthy had severe impairments, including "spondylosthe-sis," deafness in the left ear, mild hearing loss in the right ear with tinnitus, and a scattered hiatal hernia with scattered diverticular, but that the impairments did not meet or equal any Listing. (Tr. 235-36) Specifically, the ALJ concluded that McCarthy did not meet Listing 1.05(c), Disorder of the Spine, because he did not show significant muscle weakness or reflex loss despite demonstrating pain, muscle spasm, and limitation of motion in the spine. (Tr. 230) Regarding McCarthyís hearing, ALJ Harmon concluded that he did not meet Listing 2.08 because the

11

hearing in his right ear was restorable with the use of a hearing aid. (Tr. 230)

In determining McCarthyís RFC at Step Four, ALJ Harmon found that Dr. Shettyís hearing exam showed hearing loss consistent with a 1971 hearing exam. (Tr. 231). The ALJ also noted that while McCarthy demonstrated mild tenderness in the LS area during Dr. Mahawar's first exam, McCarthy showed no loss of grip strength and could perform straight leg raises "fairly well." (Tr. 231). The ALJ further noted that, despite McCarthyís severe difficulty squatting and rising, he demonstrated only mild difficulty getting on and off the examining table. (Tr. 231) Although he agreed with ME Jilhewar that McCarthy's RFC showed a capacity to undertake medium work, he did not agree with the ME's suggestion that McCarthy should be given a sit/stand option. (Tr. 231) According to the ALJ, the option was not warranted because McCarthy was unable to show muscle weakness or atrophy and because he retained a good range of motion in his knees. (Tr. 231)

In determining McCarthyís RFC, the ALJ found that McCarthy was not a credible witness. (Tr. 232) In support of this conclusion, the ALJ stated that although McCarthy rated his pain an eight on a scale from 1-10, the record did not reflect that McCarthy "adequately sought medical treatment" or "sought or received treatment from a specialist." (Tr. 233) ALJ Harmon also found that McCarthyís claims that tinnitus and dizziness had affected his ability to concentrate and to sleep were less than

12

credible. (Tr. 233) According to the ALJ, regardless of McCarthy and Margaretta's testimony on these limitations, McCarthy "failed to even mention them on numerous occasions." (Tr. 233) Although the ALJ referenced Dr. Kotler's exam in support of this position, he did not cite any other occasions at which McCarthy failed to mention his tinnitus and dizziness. (Tr. 233)  The ALJ also disregarded McCarthy's own description of his functional limita-tions, noting that when McCarthy was discharged from the hospital in June 1999 following his gastroscopy and colonoscopy, the discharge form stated that he could dress without assistance. (Tr. 217, 234) The ALJ further commented that during the course of the hearing, McCarthy "portrayed no evidence of pain or discomfort while testifying." (Tr. 234) Based on this evidence and the ALJ's observations, ALJ Harmon found that McCarthy retained the capacity to perform medium work. (Tr. 235) Because his past relevant work included light and medium work, with no requirement for acute hearing or telephone use, ALJ Harmon concluded that McCarthy could perform his past relevant work at Step Four. (Tr. 235)

On September 15, 2001, the Appeals Council granted McCar-thy's request for review, vacated the ALJ's decision and remanded for further proceedings. (Tr. 244) In remanding, the Appeals Council criticized ALJ Harmon's failure to consider post-hearing evidence, including the 2001 MRI, or submit this evidence to a ME, while at the same time rejecting ME Jilhewar's conclusion that McCarthy should have a sit/stand option. (Tr. 244) According

13

to the Appeals Council order, "[t]he evidence may substantiate
the need for a sit/stand option, and may also provide a basis for
limiting the claimant's lifting ability." (Tr. 244) Thus, the
Appeals Council directed the ALJ to resolve this issue and "any
other issues" the ALJ found appropriate. (Tr. 244-245) The
Appeals Council further directed the ALJ to obtain updated
medical records, as appropriate, and to pose hypothetical ques-
tions to a vocational expert reflecting "the specific capac-
ity/limitations established by the record as a whole." (Tr. 245)
The remand order directed the ALJ to resolve any conflicts
between the VE's occupational evidence and the Dictionary of
Occupational Titles, and finally, to provide a new hearing,
address any additional evidence and issue a new decision (Tr.
245)

ALJ Harmon held a second hearing on July 2, 2002, at which
ME Jilhewar, VE Thomas Dunleavy, McCarthy, and Margaretta testi-
fied. (Tr. 375) McCarthy testified that he did not perform any
activities around the house and rarely drove. (Tr. 383) He stated
that sitting for more than 30 minutes caused too much discomfort,
requiring him to lie down to relieve the pain, and that he spent
four to five days each week in bed. (Tr. 383, 387) He described
his pain as radiating from his low back and going from "intolera-
ble to worse." (Tr. 387) McCarthy also testified that the ringing
in his ears was constant and that he experienced dizziness two to
three times per week. (Tr. 392) He stated that he no longer read
because he was unable to concentrate. (Tr. 293) After 20 minutes

14

in the hearing, McCarthy stated that he was "ready to lie down."
(Tr. 397) Furthermore, McCarthy stated that if he were given the
ability over a period of eight hours to stand for as long, and as
often, as he felt necessary to relieve his pain that the pain
would be severe and require him to lie down for as long as three
hours. (Tr. 399)

Next, Margaretta testified that McCarthy's hearing loss
prevented him from driving because "he cannot concentrate when
thereís a lot of sounds, he gets all confused." (Tr. 403) She
also testified that McCarthy no longer read, that his hearing has
gotten worse, and that his back "[had] been going bad since I met
him in ë97." (Tr. 408)

ME Jilhewar testified that the record contained no evidence
of lower back pain from a treating physician. (Tr. 412) He also
reviewed Dr. Mahawar's comments regarding McCarthy's back condi-
tion and limitations, as well as the 2001 lumbosacral MRI, and he
repeated his disagreement with the RFC suggested by Dr. Dubois
because "there is a significant limitations to the exertional
limitation, or exertional capacity." (Tr. 416) Dr. Jilhewar
concluded that McCarthy was capable of medium work, although he
acknowledged that McCarthy's testimony indicated an inability to
perform even sedentary work. (Tr. 417) From the objective medical
evidence, ME Jilhewar found that McCarthy had an RFC to lift 50
pounds occasionally and 10 to 25 pounds frequently; a need for a
sit/stand option; and an inability to climb ropes, ladders, and
scaffolding. (Tr. 417) He stated that an orthopedic consultative

15

exam would not change his opinion on McCarthy's RFC, provided the objective findings were the same. (Tr. 418)

Following ME Jilhewarís testimony, VE Dunleavy testified that McCarthy's past work, while medium, was performed at a light level. (Tr. 435) In response to a hypothetical for a 38-year old with a high school education and one year of vocational training who could occasionally lift 50 pounds and frequently lift 10 to 25 pounds, could sit, stand, or walk for six of eight hours, but continuously for only 30 minutes, and could occasionally balance, stoop, or climb stairs and ramps, but who could not crouch, squat, kneel, crawl, use a telephone or be exposed to prolonged background noise, VE Dunleavy testified that the sit/stand option would preclude McCarthy from performing his prior work. (Tr. 437) The VE stated that existing jobs based on the hypothetical included 8,000 small product assembly jobs, 4,000 hand packaging jobs and 3,000 jobs as a sorter. (Tr. 437) In a second hypothetical for the same limitations plus the ability to lift eight pounds occasionally, frequently lift minimal weight, and the ability to lie down for at least two hours in an eight hour period, the VE testified that no work would be available. (Tr. 437-38)

Following the hearing, McCarthy provided additional records from a January 11, 2001 exam by Dr. Bhupendra Gandhi which indicate that McCarthy saw Dr. Gandhi and complained of back strain, dizziness and light headedness. (Tr. 274) The records also

16

include a note suggesting the possibility of an ear or sinus infection. (Tr. 274)

On August 16, 2002, Dr. Mahawar performed a third consultative exam. (Tr. 275) Dr. Mahawar reported in one portion of the record that McCarthy experienced muscle spasms in his lumbar spine and constant ringing in his ear. (Tr. 245) Later in the report, he noted that while McCarthy experienced pain when bending, he showed no significant tenderness or muscle spasm in his spine. (Tr. 276) Dr. Mahawar described McCarthyís "mildly antalgic gait" and noted McCarthyís "mild" difficulty in getting on and off the exam table, tandem walking, walking on toes, walking on heels, squatting and arising, and hopping on one leg. (Tr. 277) According to Dr. Mahawar, McCarthy was diagnosed with chronic low back pain with grade I spondylolisthesis at L5 - S1 and hearing loss with tinnitus. (Tr. 277)

Dr. Mahawar also completed an RFC for McCarthy on August 16, 2002. (Tr. 280-283) In this RFC, Dr. Mahawar indicated that McCarthy could stand or walk for two hours in an eight hour day, had an unlimited ability to sit, was mildly or moderately limited in his ability to push and pull with his lower extremities, and occasionally could climb, crouch, crawl or stoop. (Tr.280-81) He further opined that McCarthy had the ability to lift 20 pounds occasionally and lift 10 pounds frequently. (Tr. 280) Dr. Mahawar also referred McCarthy to Dr. Pankaj J. Patwari, a diagnostic radiologist, whose consultive examination showed grade 1 spondylolisthesis and spondylolysis at the L5-S1 level as well as

17

"mild ostearthritic changes in the remaining lumbar spine." (Tr. 279)

On December 12, 2002, the ALJ provided Dr. Mahawarís records from the August 16, 2002 exam and assessment to Dr. Jilhewar and asked if the records resulted in any change to the testimony he provided at the hearing. (Tr. 284)  Somewhat unclearly, Dr. Jilwehar responded, "Additional evidence does not change my opinion but now there are problems with additional evidence." (Tr. 286) Specifically, he noted that McCarthy did not show signs of motor weakness and the record contained no evidence of paravertebral muscle spasm. (Tr. 286) Dr. Jilhewar also noted that spondylolisthesis was present "even during the years claim-ant worked." (Tr. 286) He concluded, "I request your honor to give more weight to RFC in [Dr. Mahawarís August 16, 2002 RFC assessment] if they were performed by a consultative examiner." (Tr. 286)

On September 23, 2003, the ALJ issued a second written decision finding that McCarthy was not entitled to disability insurance benefits. (Tr. 23-31) He found that McCarthy had not engaged in substantial gainful activity at Step One, and at Step Two he found that McCarthyís impairments, spondylolisthesis of the lumbar spine, deafness in the left ear, mild hearing loss in the right ear with tinnitus, hiatal hernia, and scattered diver-ticulum, were severe. (Tr. 26, 29)

The ALJ reviewed the results of the January 2001 MRI, Dr. Mahawar's August 16, 2002 consultative exam, and the lumbar spine

18

x-ray by Dr. Patwari to conclude that McCarthy's impairments did
not meet or equal a listed impairment at Step Three. (Tr. 26)

Next, the ALJ turned to McCarthy's RFC determination. The
ALJ recounted McCarthy's testimony that he rarely left the house
or drove due to pain that McCarthy rated as a seven on a scale of
one to ten. (Tr. 27) The ALJ described McCarthy's need to use a
speaker phone due to constant ringing in his ears and the fre-
quency of his dizziness. The ALJ also noted Margaretta's testi-
mony in which she described McCarthy's inability to follow
conversations and the degree to which McCarthy had been bed
ridden over the prior year and a half. (Tr. 27)

The ALJ found Margaretta's testimony credible as to her
observations of McCarthy's behavior.  However, regarding McCar-
thy, the ALJ concluded that "to the extent that the claimant
alleges an inability to perform any significant work activities
on a sustained basis, his allegations and subjective complaints
are found not to be full credible when considered in light of the
entirety of the evidence of the record." (Tr. 27) According to
the ALJ, McCarthy's "extreme allegations" regarding his hearing
loss and back pain were not supported. The ALJ stated that he
concluded "very similarly as I did in my prior decision, except
as modified specifically herein by the RFC in the first hypothet-
ical to the vocation expert." (Tr. 27)

The ALJ concluded that McCarthy had an RFC for "simple tasks
due to a combination of pain and some periods of dizziness and
lightheadedness, lifting 10 to 25 pounds frequently and 50 pounds

19

occasionally, standing and/or walking for six hours in an eight hour workday, sit/stand option every 30 minutes, occasional climbing ramps or stairs, stooping or balancing and no climbing ladders, ropes or scaffolds, heights, hazardous machinery, squatting, crouching, kneeling, crawling, concentrated exposure to background noise or telephone use." (Tr. 27)

Unlike his prior decision, ALJ Harmon determined that McCarthy was unable to perform past relevant work at Step Four in his second decision. (Tr. 28). However, he adopted VE Dunleavy's response to the ALJ's first hypothetical to conclude that McCarthy had the residual functional capacity to perform a significant range of medium work, including 8,000 jobs as a small parts assembler, 4,000 jobs as a hand packager, and 3,000 jobs as a sorter. (Tr. 28-30)

## Discussion

The standard for judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is limited to a determination of whether those findings are supported by substantial evidence.  42 U.S.C. ß405(g) ("The findings of the Commissioner of Social Security, as to any fact, if supported by substantial evidence, shall be conclusive."); *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005); *Lopez ex rel Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003).  Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept to support such a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28

L.Ed.2d 852, (1972)(*quoting* **Consolidated Edison Company v. NRLB**, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed.2d 140 (1938)). *See also* **Jens v. Barnhart**, 347 F.3d 209, 212 (7th Cir. 2003); **Sims v. Barnhart**, 309 F.3d 424, 428 (7th Cir. 2002).  An ALJís decision must be affirmed if the findings are supported by substantial evidence and if there have been no errors of law. **Rice v. Barnhart**, 384 F.3d 363, 368-369 (7th Cir. 2004); **Scott v. Barnhart**, 297 F.3d 589, 593 (7th Cir. 2002).  However, "the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues." **Lopez**, 336 F.3d at 539.

Disability insurance benefits are available only to those individuals who can establish "disability" under the terms of the Social Security Act.  The claimant must show that he is unable

> to engage in any substantial gainful activity
> by reason of any medically determinable phys-
> ical or mental impairment which can be ex-
> pected to result in death or which has lasted
> or can be expected to last for a continuous
> period of not less than 12 months.

42 U.S.C. ß 423(d)(1)(A)

The Social Security regulations enumerate the five-step sequen-tial evaluation to be followed when determining whether a claim-ant has met the burden of establishing disability.  20 C.F.R. ß404.1520.  The ALJ first considers whether the claimant is presently employed or "engaged in substantial gainful activity." 20 C.F.R. ß404.1520(b).  If he is, the claimant is not disabled and the evaluation process is over; if he is not, the ALJ next addresses whether the claimant has a severe impairment or combi-

21

nation of impairments which "significantly limits . . . physical or mental ability to do basic work activities."  20 C.F.R. ß404.1520(c).  Third, the ALJ determines whether that severe impairment meets any of the impairments listed in the regula- tions.  20 C.F.R. ß401, pt. 404, subpt. P, app. 1.  If it does, then the impairment is acknowledged by the Commissioner to be conclusively disabling.  However, if the impairment does not so limit the claimant's remaining capabilities, the ALJ reviews claimant's "residual functional capacity" (RFC) and the physical and mental demands of his past work.  If, at this fourth step, the claimant can perform his past relevant work, he will be found not disabled.  20 C.F.R. ß404.1520(e).  However, if the claimant shows that his impairment is so severe that he is unable to engage in his past relevant work, then the burden of proof shifts to the Commissioner to establish that the claimant, in light of his age, education, job experience and functional capacity to work, is capable of performing other work and that such work exists in the national economy.  42 U.S.C. ß423(d)(2); 20 C.F.R. ß404.1520(f).

As a preliminary matter, the court must clarify the proce- dural posture of this case under the law of the case doctrine. The doctrine provides that, "[o]nce an appellate court either expressly or by necessary implication decides an issue, the decision will be binding upon all subsequent proceedings in the same case." ***Key v. Sullivan***, 925 F.2d 1056, 1060 (7th Cir. 1991). Applying the doctrine requires careful consideration of

22

the remand order to determine which issues previously have been determined. *Key*, 925 F.2d at 1061. Conversely, if an issue has been left open, the lower tribunal is free to decide it. *Key*, 925 F.2d at 1061. More commonly, the law of the case doctrine applies to a trial court conducting subsequent proceedings after appellate review, but its application also extends to administrative proceedings. *See, e.g. Wilder v. Apfel*, 153 F.3d 799, 803 (7th Cir. 1998)("The law of the case doctrine, which requires 'the trial court to conform any further proceeding on remand to the principles set for in the appellate opinion unless there is a compelling reason to depart' is applicable to judicial review of administrative decisions.") Even when the remand is from the Appeals Council and not a district or circuit court, the ALJ on remand is guided by the specific direction provided by the Appeals Council remand order. *See e.g. Kelly v. Barnhart*, 138 Fed. Appx. 505, 506 (3rd Cir. 2005)(describing Appeals Council vacation of ALJís decision as a directive to reassess only the step four determination.); *Mazurek v. Massanari*, 2001 WL 1251453, at *5 (E.D. Pa. Sept. 24, 2001)("The fact that the Appeals Council vacated the prior decision . . . does not mean . . . the ALJ was prohibited from making any reference to it."). Finally, law of the case is not applicable when "substantial new evidence is introduced after the first review." *Key*, 925 F.2d at 1060.

Here, the Appeals Council directed the ALJ to reconsider McCarthy's maximum exertional capacity, and specifically whether a sit/stand option was warranted by the January 2001 MRI. (Tr.

244) The Appeals Council further directed the ALJ to resolve any other issues in accordance with administration rules and regula- tions and to resolve any conflicts between the VE's testimony and the Dictionary of Occupation Titles ("DOT"). (Tr. 245) The Appeals Council did not require a de novo hearing, but it re- quired the ALJ to offer McCarthy a new hearing, address new evidence, and issue a new decision. Consequently, those issues previously determined and not made subject to the remand order or altered by substantial new evidence remain part of the record.

McCarthy first alleges that the ALJ erred at Step Three by failing to discuss sufficiently or to cite to any listing section when determining that McCarthyís impairments did not individually or in combination meet or exceed the listing requirement for spine and hearing disorders. Further, McCarthy contends that he meets the listing standard for Disorders of the Spine, Listing 1.04(c) and Hearing Disorders, Listing 2.08.

McCarthy bears the burden of showing presumptive disability at Step Three by demonstrating his impairments meet or equal a Listing. *See* 20 C.F.R. ß404.1526(a).  *See also* **Maggard v. Apfel**, 167 F.3d 376, 380 (7th Cir. 1999)(*citing* **Steward v. Bowen**, 858 F.2d 1295, 1297 n.2 (7th Cir. 1988)). According to SSR 86-8, "the set of symptoms, signs and laboratory findings in the medical evidence supporting a claim must be compared with, and found to be equivalent in terms of medical severity and duration, to the set of symptoms, signs and laboratory findings specified for a listed impairment." SSR 86-8 at *3; **Maggard**, 167 F.3d at 380 ("To

24

meet or equal a listed impairment, the claimant must satisfy all
of the criteria of the listed impairment.") The determination of
medical equivalence may be made only upon medical evidence
"supported by medically acceptable clinical and laboratory
techniques" or the "medical opinion given by one or more medical
or psychological consultants designated by the Commissioner." 20
C.F.R. ß404.1526(b).  However, "[t]he signature of a state agency
medical or psychological consultant on . . . a Disability Deter-
mination and Transmittal Form . . . ensures that consideration
. . . has been given to the question of medical equivalence." SSR
96-6p at *3.

Despite the claimant's burden to demonstrate equivalence,
the ALJ must at least "minimally articulate his or her justifica-
tion for rejecting or accepting evidence of disability." ***Scheck
v. Barnhart***, 357 F.3d 697, 700 (7th Cir. 2004); ***Brindisi v. Barn-
hart***, 315 F.3d 783 (7th Cir. 2003)("[F]ailure to discuss or even
cite a listing, combined with an otherwise perfunctory analysis,
may require remand.")

Listing 1.04(c) describes disorders of the spine and re-
quires the claimant to show a disorder that results in "compro-
mise of a nerve root . . . or the spinal cord [w]ith [l]umbar
spinal stenosis resulting in pseudoclaudication, established by
findings . . . [and] manifested by chronic nonradicular pain and
weakness, and resulting in inability to ambulate effectively."
Pt. 404, Subpt. P, App. 1 Listing 1.04(c). Section
1.00(B)(2)(b)(1) describes the inability to ambulate as "an

extreme limitation of the ability to walk."  Such a limitation is
characterized by "insufficient lower extremity functioning to
permit independent ambulation without the use of hand-held
assistive device(s) that limits the functioning of both upper
extremities." Pt. 404, Subpt. P, App. 1 ß1.00(B)(2)(b)(1)

Listing 2.08 describes hearing impairments, which are
limited to

> hearing not restorable by a hearing aid,
> manifested by average hearing threshold sen-
> sitivity for air conduction of 90 decibels or
> greater and for bone conduction to corre-
> sponding maximal levels, in the better ear,
> determined by the simple average of hearing
> threshold levels at 500, 1000 and 2000 hz, or
> speech discrimination scores of 40 percent or
> less in the better ear.

> (Pt. 404, Subpt. P, App. 1 ßß2.08A and B)

Although McCarthy alleges that he meets the listing require-
ment for both lumbar and hearing disorders, he has not pointed to
evidence in the record that is inconsistent with the ALJ's
conclusion. To meet the Listings, McCarthy must show that he
suffered from the characteristics described in Part 1.04(c),
including an "extreme limitation of his ability to walk," or Part
2.08, describing threshold hearing levels below certain levels
and "not restorable by a hearing aid."  Here, ALJ Harmon relied
on the signed  Disability Determination forms, which provide
conclusive evidence that the question of equivalency has been
examined, as well as the opinion of the Medical Expert who
testified at the hearing.  ME Jilhewar testified that McCarthy's
condition did not meet the requirements for Listing 2.08 because

26

his speech discrimination scores were not within the listing
range. (Tr. 413)  Similarly, the ME testified that McCarthy did
not meet the requirements for Listing 1.04(c), because he failed
to show findings supporting an inability to ambulate. (Tr. 416)
Because McCarthy does not provide any countervailing evidence, it
cannot be said that the ALJ's articulated rationale is unsup-
ported by the record. *See **Scheck***, 357 F.3d at 700.

McCarthy next asserts that the ALJís Step Four RFC determi-
nation is flawed on numerous grounds. He argues that the ALJ
failed to make a credibility determination in accordance with
SSR-96-7p and as a result the RFC does not reflect the extent of
his pain, tinnitus, and need to communicate face-to-face. He also
argues that the ALJ ignored evidence in the record and did not
give sufficient weight to the testimony of specialists.

The ALJ must determine a claimantís credibility only after
considering all of the claimantís symptoms "and the extent to
which [the claimantís] symptoms can reasonably be accepted as
consistent with the objective medical evidence and other evi-
dence." 20 C.F.R. ß404.1529(a).  If the claimantís impairments
reasonably could produce the symptoms of which the claimant is
complaining, the ALJ next must evaluate the intensity and persis-
tence of the symptoms through consideration of the claimantís
"medical history, the medical signs and laboratory findings, and
statements from [the claimant, the claimantís] treating or
examining physician or psychologist, or other persons about how
[the claimantís] symptoms effect [the claimant]." 20 C.F.R. ß

27

404.1529(c)(1). If the symptoms the claimant described were not supported by the objective medical evidence, "the ALJ must obtain detailed descriptions of the claimantís daily activities by directing specific inquiries" about the symptoms and their affect on him. *Clifford v. Apfel*, 227 F.3d 863, 871 (7th Cir. 2000) (*quoting* *Luna v. Shalala*, 22 F.3d 687, 691 (7th Cir. 1994)).

While a claimantís complaints of disability cannot be based on symptoms totally unfounded in medical findings, the ALJ may not make a credibility determination "solely on the basis of objective medical evidence." SSR 96-7p, at *1. *See also* *Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004)("If pain is disabling, the fact that its source is purely psychological does not disentitle the applicant to benefits."); *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004). In addition, the ALJ must make more than "a single, conclusory statement . . . The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individualís statements and the reasons for that weight." SSR 96-7p, at *2. *See* *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001); *Diaz v. Chater*, 55 F.3d 300, 307-08 (7th Cir. 1995) (finding that the ALJ must articulate, at some minimum level, his analysis of the evidence). The ALJ must "build an accurate and logical bridge from the evidence to [his] conclusion." *Zurawski*, 245 F.3d at 887 (*quoting* *Clifford*, 227 F.3d at 872). The court

28

will sustain the ALJís credibility determination unless it is "patently wrong" and not supported by the record. **Jens**, 347 F.3d at 213; **Powers v. Apfel**, 207 F.3d 431, 435 (7th Cir. 2000). Furthermore, the ALJís "unique position to observe a witness" entitles his opinion to great deference. **Nelson v. Apfel**, 131 F.3d 1228, 1237 (7th Cir. 1997).  However, if the ALJ does not make explicit findings and does not explain them "in a way that affords meaningful review," the ALJís credibility determination is not entitled to deference. **Steele v. Barnhart**, 290 F.3d 936, 942 (7th Cir. 2002).

Social Security Ruling 96-7p provides that an adjudicator may "find an individualís statements, such as statements about the extent of functional limitations or restrictions due to pain or other symptoms, to be credible to a certain degree." SSR 97-7p at *4. The rule establishes a series of factors that the ALJ must consider when assessing the credibility of an individual's statements, including daily activities, the type, dosage, effec-tiveness and side effects of medication, treatments other than medication sought by the claimant and the reasons that the plaintiff may not seek treatment. SSR 97-7p at *3.

ALJ Harmonís single conclusory statement that McCarthy's "allegations of debilitating back pain and the need to lie down much of the time during the day," as well as his "extreme allega-tions regarding his hearing loss are not fully supportable" fails to demonstrate the extent to which the ALJ found McCarthy less than credible or the rationale supporting this conclusion.

(Tr. 27). The only explanatory statement in his decision regard-
ing the conclusion that McCarthy's allegations of pain and
hearing loss were not credible is the statement, "I conclude very
similarly as I did in my prior decision (Exhibit 3A) except as
modified specifically herein by the RFC in the first hypothetical
to the vocational expert." (Tr. 27)  It is not clear whether the
ALJ intended with this statement to make reference to his prior
credibility determination or whether he was referring generally
to the fact that the RFC that resulted from the second decision
is similar to the first.  However, even if the ALJ were attempt-
ing to rely on the prior credibility determination,  it is not
clear how doing so would account for the almost year and a half
that passed between the two hearings. While the ALJ examined the
factors under SSR 96-7p in the previous April 2001 decision, he
does not explain why that credibility determination remains
accurate in the September 2002 decision, particularly given the
significant additional information that had been added to the
record.  This additional evidence caused the ALJ to modify
McCarthyís RFC, specifically with the addition of a sit/stand
option.  However, the ALJ did not indicated what, if any, impact
this evidence had on McCarthyís credibility determination.   It
also is not clear whether the ALJ gave this evidence any consid-
eration when assessing McCarthyís subjective complaints of pain.
*See* SSR 96-7p ("[T]he adjudicator must make a finding on the
credibility of the individualís statements based on a consider-
ation of the entire case record."); ***Indoranto***, 374 F.3d at 474.

30

The source of the ALJís credibility determination is made less clear by its joint reference to back pain and hearing loss. The medical evidence regarding McCarthyís hearing loss appears to be consistent throughout the record. (Tr. 122, 125, 128, 133, 140, 227).  While the ALJ's first decision found McCarthy's allegations of pain and persistent dizziness less than credible, it was silent on the question of McCarthyís allegations regarding his hearing loss.  However, by the second decision, the ALJ concluded that McCarthy's allegations regarding hearing loss were "extreme." The ALJ points to no evidence to account for this characterization or to explain why he did not reach this conclusion in the first decision. While the ALJ notes that McCarthy has not presented substantial evidence to show that he suffers from Meniere Disease, he seems to ignore that McCarthyís hearing loss is a condition separate from Meniere Disease and amply documented in the record.  Similarly, the ALJ based his first credibility determination regarding McCarthyís back pain in part on his own observation that McCarthy did not appear to be in discomfort over the course of the hearing. However, he specifically notes in the second decision that McCarthy's posture during the hearing supports his allegations of back pain.

Finally, Margaretta testified regarding McCarthyís loss of hearing, his difficulty concentrating, as well as the intensity of his back pain and his inability to assist her during her own recent medical recovery. (Tr. 402-406) In finding Margaretta's testimony credible, the ALJ has not explained how her testimony,

which is consistent with McCarthy's, may be found credible while his was not.

In sum, the ALJ's single, conclusory statement is an insufficient basis on which to rest his credibility determination. *See Zurawski,* 245 F.3d at 887; *Delaney v. Barnhart*, 2005 WL 1655204 at *7 (N.D. Ill. 2005)("[T]he ALJ must take care to articulate which information he relies upon when making his determinations and findings.") In addition, the ALJ's reliance on his previous credibility determination is inadequate because the two decisions conflict in certain respects and because such reliance does not account for the passage of time or evidence produced subsequent to the first decision.  For these reasons, this case must be remanded.

McCarthy also alleges that the ALJ improperly relied on a non-specialist's testimony to refute a treating physician's records, according to 20 C.F.R. §404.1527(d)(5). McCarthy alleges that the ALJ relied on the testimony of the ME to refute the conclusions of treating doctors, however McCarthy does not point out which records the ALJ is alleged to have disregarded. Further, this regulation provides that an ALJ should "generally give more weight to the opinion of a specialist." The rule does not prevent an ALJ from relying on non-specialist's testimony. *See Scheck,* 357 F.3d at 702.

Finally, McCarthy asserts that the ALJ failed to include McCarthy's tinnitus, hearing loss, and pain, and further failed to explain conflicts between the VE's testimony and the DOT at

32

Step Five. To the extent that the ALJ relies on testimony from a VE, the question posed to the expert must incorporate all relevant limitations from which the claimant suffers. *Kasarsky v. Barnhart*, 335 F.3d 539, 543 (7th Cir. 2003). The ALJ, however, need incorporate impairments in his questions to the vocational expert only to the extent that the ALJ found them supported by evidence in the record. *Sims*, 309 F.3d at 432. Because the court remands this case to the ALJ to clarify his credibility determination, the question of how to  characterize these impairments to a VE remains open. *See McCombs v. Barnhart*, 106 Fed. Appx. 480, 486 (7th Cir. 2004)("In light of our conclusion that the ALJ must reconsider the evidence regarding [claimant's] pain, it is necessary also for the RFC determination to be considered on remand.")

The court recognizes two issues that should be addressed in response to additional VE testimony. The VE testified that McCarthy, whose RFC  included "no concentrated exposure to background noise," is capable of performing work as a small parts assembler, hand packager, and sorter. Though the Appeals Council specifically directed the ALJ to resolve any conflicts between the VE's testimony and the Dictionary of Occupational Titles, the ALJ did not explain why these remain appropriate jobs for McCarthy despite their categorization in the DOT as noise level 4, or "loud." McCarthy's counsel did not object to this at the hearing, and consequently, may not challenge it here. *See Donahue v. Barnhart*, 279 F.3d 441, 446-447 (7th Cir. 2000). However, on remand the court urges the ALJ, as did the Appeals Council, to resolve

such inconsistencies. Finally, the ALJ accommodated pain, dizziness and lightheadedness in the RFC and the hypothetical to the VE by limiting the hypothetical to "simple tasks."  On remand, the court urges the ALJ to incorporate the RFC with greater specificity. *See* **Hedgepeth v. Apfel**, 2000 WL 655019 at *3 (7th Cir. 2000); **Mont v. Chater**, 1997 WL 201626 at *6 (7th Cir. 1997).

————————————

For the foregoing reasons, the Motion for Summary Judgment filed by the plaintiff, Mike McCarthy, on January 28, 2005 is **GRANTED.**


ENTERED this 30th day of January, 2006


s/ ANDREW P. RODOVICH
United States Magistrate Judge

34